Matthew J. Oppenheim (matt@oandzlaw.com)
Scott A. Zebrak (scott@oandzlaw.com)
Julie C. Chen (julie@oandzlaw.com)
Oppenheim + Zebrak, LLP
4400 Jenifer Street, NW, Suite 250
Washington, DC 20015
Tel: (202) 621-9027
Fax: (866) 766-1678

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE MCGRAW-HILL COMPANIES, INC. and PEARSON EDUCATION, INC.<br><br>       Plaintiffs,<br><br>  v.<br><br>CHARLES A. JONES; CA JONES MANAGEMENT GROUP, LLC; COLLEGE BOOK RENTAL COMPANY LLC, D/B/A COLLEGEBOOKRENTER.COM; JAMES W. BYARS; SE BOOK COMPANY, LLC D/B/A SOUTHEASTERN BOOK COMPANY; EXCESS, LLC, D/B/A INNOVATIVE PRINTING; BLACKROCK INVESTMENTS, LLC; MARC PEEBLES; EDUARDO RIVADENEYRA; INTER-EXPRESS FORWARDING, INC.; ACCU COPY D/B/A ACCU LINK; TOM O'BRIEN; and DOES 1-10,<br><br>       Defendants. | **Case No.**<br><br><br><br><br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE AND FOR EXPEDITED DISCOVERY** |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT…………………………………………………………..  1

STATEMENT OF FACTS…………………………………………………………….  2

    1.    A Good Samaritan Report to McGraw-Hill…………………………………  3

    2.    CBR and the Connection with Murray, Kentucky…………………………...  4

    3.    Defendants' Counterfeit Textbook Chop Shop Enterprise…………………...  5

    4.    Defendants Continue to Rent Counterfeit Textbooks and to Expand
        Their Enterprise………………………………………………………………....  8

ARGUMENT FOR TEMPORARY RESTRAINING ORDER…………………………..  10

    I.    Plaintiffs Can Show a Likelihood of Success on the Merits………………...  11

        A.    Direct Copyright Infringement…………………………………….  11

        B.    Contributory Copyright Infringement……………………………  13

        C.    Vicarious Copyright Infringement…………………………………  14

        D.    Violating the Integrity of Copyright Management Information……...  15

        E.    Trademark Counterfeiting……………………………………….....  16

    II.    Plaintiffs Will Suffer Irreparable Injury in the Absence of Immediate
        Injunctive Relief……………………………………………………………....  17

    III.    The Balance of Hardships And Public Interest Tip Decidedly In
        Plaintiffs' Favor……………………………………………………………....  18

    IV.    The Public Interest Will Not Be Disserved By the Issuance of a
        Preliminary Injunction.………………………………………………………....  19

ARGUMENT FOR EXPEDITED DISCOVERY…………………………………………  20

CONCLUSION………………………………………………………………………....  21

SUPPORTING DOCUMENTS

    EXHIBIT 1 – Declaration of Michael Hays

    EXHIBIT 2 – Declaration of Richard P. Essig

    EXHIBIT 3 – Declaration of Richard Rosetti

    EXHIBIT 4 – Declaration of Timothy Hampton

    EXHIBIT 5 – Declaration of Charles A. Jones

    EXHIBIT 6 – Affidavit of James W. "Bud" Byars

    EXHIBIT 7 – Plaintiffs Requests for Expedited Production of Documents

Plaintiffs The McGraw-Hill Companies, Inc. ("McGraw-Hill") and Pearson Education, Inc. ("Pearson") respectfully submit this Memorandum in Support of their Motion for an Order to Show Cause why a Temporary Restraining Order or Preliminary Injunction Should Not Issue and for Expedited Discovery.

## PRELIMINARY STATEMENT

Plaintiffs in this action are two of the world's leading educational publishers. They create and distribute some of the world's best-known and best-selling textbooks, which are sold and rented in the United States and internationally.

Defendant College Book Rental Company LLC ("CBR") is a large, online textbook rental company that has experienced explosive growth in the last several years. But, rather than supplying its inventory from only legitimate sources, CBR obtains its considerable stockpile of books from a massive, highly illegal counterfeiting operation. Through a web of businesses, Defendants create altered textbooks with counterfeit covers that infringe the intellectual property of Plaintiffs. These counterfeit-covered books infringe on Plaintiffs' copyrights and trademarks. Moreover, by removing the copyright pages from these books, as Defendants do, Defendants violate the Copyright Management Information ("CMI") provisions of the Digital Millennium Copyright Act ("DMCA").

Acting together, these Defendants, individually and through their corporate structures, engage in a host of unlawful activity. This includes altering or removing CMI as well as reproducing and distributing counterfeit-covered copies of Plaintiffs' copyrighted textbooks, which they then rent to unsuspecting students. Without a temporary restraining order and preliminary injunction to prevent Defendants from further engaging in these illegal and deceptive

1

practices, Plaintiffs will suffer irreparable injury that cannot be compensated with monetary damages.

### STATEMENT OF FACTS

Plaintiffs are publishers of educational books and multimedia materials in all subject areas and grade levels, operating under numerous imprints, with a rich educational and literary heritage.  They publish of some of the best-selling textbooks that are used by universities, colleges, and institutions of learning throughout the United States.  These titles include *College Physics, Concepts of Genetics, Managerial Accounting, The Art of Public Speaking,* and *Educational Psychology*, many of which have been published in multiple editions.  Hays Decl. ¶ 14, Essig Decl. ¶ 12.

Plaintiffs' textbooks have achieved acclaim not only in the United States, but also in many other countries around the world.  Apart from the U.S. Editions, their textbooks are distributed internationally as International Editions.  Plaintiffs, as publishers whose core purpose is to educate the world, recognize that students around the world should have access to world-class educational resources.  Hays Decl. ¶ 9, Essig Decl. ¶ 8.  Thus, in order to make available International Edition textbooks to students in developing countries, Plaintiffs and other publishers will often sell International Editions at lower price points than they do U.S. Editions. Hays Decl. ¶ 9; Essig Decl. ¶ 9.

Plaintiffs restrict the sale of their International Editions to the developing countries in which they are sold in order to avoid having those textbooks resold in the United States at below market prices where they would undercut Plaintiffs' U.S. sales.  Essig Decl. ¶ 9.  They do so by placing on the covers of International Edition books large, bold markings, such as stickers, stamps or logos, indicating that a book is an International Edition and that it is not for sale in

North America.  Essig Decl. ¶ 11; Hays Decl ¶ 8.  These books also have different internal copyright pages and are tracked through different ISBN numbers, among other variations.  All of these various markings help identify the book and the territorial limitations for any re-distribution.  Hays Decl. ¶ 10; Essig Decl. ¶ 10.

   In addition to having different markings, International Edition textbooks may contain content that is different from a U.S. Edition. Essig Decl. ¶ 8.  In this respect, it is important for students to purchase the edition that has been assigned to them by their professors.     Essig Decl. ¶ 8.

**1.  A Good Samaritan Report to McGraw-Hill.**

   On May 30, 2012, the former manager of a UPS store in Paducah, Kentucky contacted Plaintiff McGraw-Hill.  Hays Decl. ¶ 15.  The former UPS employee informed McGraw-Hill that in May of this year, he had shipped boxes for Marc Peebles at Innovative Printing & Graphics in Murray, Kentucky, to Tom O'Brien of Accu Link in Greenville, North Carolina.  *Id*. The former UPS employee recounted that, in the course of his efforts, three large boxes had broken open. Inside the boxes, he saw "massive" quantities of uncut, unbound, book covers for four different book titles: *Educational Psychology*, 5th Edition*, by John Santrock; *The Art of Public Speaking* by Stephen E. Lucas; *Organic Chemistry* by Smith; and *Essentials of Lifespan Development* by Santrock.  *Id.*  All of these books were McGraw-Hill textbooks that have on their covers the well-known McGraw-Hill red logo.  *Id.*  Also in the boxes were new, fully bound copies of each of the titles described above.  *Id.*  The caller advised Plaintiff McGraw-Hill that, despite being brand new books that the caller described as even sounding new when opened, the textbooks displayed a "Used" sticker on their spine.  *Id.*

3

**2.   CBR and the Connection with Murray, Kentucky**.

Shortly after this contact by the former UPS employee, Plaintiffs received more evidence pointing to unauthorized copying and altering of their textbooks in Murray, Kentucky.  On July 9, 2012, McGraw-Hill received books it was advised had been purchased by Missouri Book Service from Defendant CollegeBookRenter.com.  CollegeBookRenter.com is the online storefront for Defendant CBR and is based out of Murray, Kentucky.   The titles included *The Art of Public Speaking* by Lucas and *Microbiology: A Systems Approach* by Cowan.  According to McGraw-Hill's review, these books had covers that had been created from scanned files and had been rebound.  The covers on their books were not created by or for McGraw-Hill, and the copyright pages had been removed altogether.  Hays Decl. ¶ 16.

Another retailer, Rafter, Inc. ("Rafter"), voiced its concern that CollegeBookRenter.com was renting counterfeit or altered textbooks at below market prices.  Hays Decl.  ¶ 17. Rafter provided McGraw-Hill with several samples of textbooks that it advised it had obtained online from CBR.  Hays Decl. ¶ 17.  These books included:  *Microbiology: A Systems Approach* by Cowan; *Business Driven Information Systems* by Baltzan; *The Art of Public Speaking* by Lucas; and *Human Biology* by Mader.  *Id.*  Upon inspection, the inside pages of these books were from McGraw-Hill International Editions, but the covers were not the original McGraw-Hill covers for the International Editions; instead, the International Edition covers were replaced with counterfeit covers of the U.S. Edition covers.  Hays Decl. ¶ 18.  The newly printed covers that were rebound onto the International Editions included the trademarks of Plaintiffs on it.  *Id.*  In some cases, the copyright pages were also removed entirely, so the copies had no copyright page. *Id.*

On August 1, 2012, Plaintiff Pearson also received a book that Rafter obtained from CBR, suspecting it was an International Edition book rebound with a counterfeit cover. Essig Decl. ¶ 16. The title was *College Physics* by Young, published by Plaintiff Pearson. When Pearson inspected this book, it discovered that the cover was a reproduction of the cover of the U.S. Edition that had been rebound onto the International Edition of the book. Essig Decl. ¶ 16. The newly printed covers which were rebound onto International Editions included the trademarks of Plaintiffs on them. *Id.* at ¶ 14. Beyond the cover being reproduced, the copyright pages inside of these books had been removed altogether. *Id.* Content that appears on the inside of the front and back covers of the U.S. Edition instead appeared on separate pages inserted into the counterfeit book. *Id.*

### 3. Defendants' Counterfeit Textbook Chop Shop Enterprise

Because neither of Plaintiffs had licensed Innovative Printing or Accu Link to reproduce, alter, or print their textbooks, and because of the counterfeit-covered books being rented online by CBR, Plaintiffs authorized their counsel, Oppenheim + Zebrak, LLP, to engage the services of The Rosetti Group, LLP ("TRG") to investigate and confirm the nature and scope of the apparent counterfeiting activities. Rosetti Decl ¶ 2. TRG interviewed former and current employees of Defendants, conducted physical inspection of Defendants' facilities, and researched public records and information. The investigation uncovered a web of individuals and companies systematically engaged in counterfeiting the covers of highly popular textbooks for their commercial gain. Under the direction and management of Defendant Jones, working in conjunction with suppliers and business partners, Defendants are purchasing International Edition textbooks, literally cutting them into pieces to remove their covers and any pages that refer to the fact that they are International Editions, printing U.S. Edition covers and replacement

pages, and renting them as legitimate U.S. Editions. Defendants are running the publishing industry's equivalent of a textbook chop shop.

Defendant Jones owns a number of businesses in the Murray, Kentucky area. Rosetti Decl. ¶ 4. One of those businesses is Defendant CA Jones Management Group, LLC ("CAJM"), a management company owned by Jones to provide management and employees for his businesses. Jones Decl. ¶ 13.[1] Defendant Byars has been an employee of CAJM since July 2008 and the President of CBR since 2010. Byars Decl. at. ¶ 3.

One of the businesses for which CAJM provides management and employees is Defendant South Eastern Book Company ("SEB"), a book wholesaler that Jones acquired in 2008. Jones Decl. ¶¶ 1, 6. Through SEB, Defendants have been purchasing International Editions of Plaintiffs' textbooks from suppliers like Defendants Eduardo Rivadeneyra and Inter-Express Forwarding. Hampton Decl. ¶ 7. Defendants purchased these International Edition textbooks by the truckloads. Rosetti Decl. ¶ 11.

After purchasing these International Editions, Defendants bring them to a ware-house where they are be given face-lifts and other alterations to make them appear as U.S. Editions. When Defendants first began this operation, they used employees and student-athletes from Murray State University. Hampton Decl. ¶ 5; Rosetti Decl. ¶ 14. Defendants instructed their employees to alter these International Editions by: (a) using black electric tape or "Used Book" stickers to cover up the labels or markings that identified the books as International Editions not for sale in the United States; (b) using hot irons or baby powder to remove stickers that identified the books as International Editions not for sale in the United States; and/or (c) using dremels to

---

[1] The Jones and Byars Declarations attached hereto were submitted August 3, 2012 in conjunction with an unrelated proceeding, *David Griffin v. Charles A. Jones, et al.,* 5:12-cv-00033, Western District of Kentucky.

file off logo stamps identifying the books as International Editions not for sale in the United States.  Hampton Decl. ¶ 4; Rosetti Decl. ¶¶ 12, 14.  One former SEB employee estimates that Defendants' employees, sitting in groups of six or more at large tables, altered up to 10,000 textbooks a month.  Rosetti Decl. ¶ 13.   Defendants would then place the altered textbooks into their inventory for rental.  *Id.*  To accommodate this business, Defendants started CBR in mid-2009 as an Internet textbook rental business. Byars Decl. ¶ 4.  SEB has converted a large part of its business operations to internet purchases and sales.  Byars Decl. ¶ 4.

Despite Defendants' efforts, there were some International Edition textbooks whose markings were too significant to alter using their current methods.  In mid-2010, Defendants decided that rather than physically removing the international markings on the covers of International Editions, they would instead slice off the cover and substitute it with a copy of a U.S. Edition cover.  This idea was apparently hatched when Defendants met with one of their suppliers, the Ingram Book Company ("Ingram"), in Lebanon, Tennessee.  Hampton Decl. ¶¶ 8, 9.  While touring the printing and binding facilities of Ingram, Defendants realized that they could purchase all of the equipment they needed to create, reproduce, and bind covers and pages of U.S. Edition textbooks themselves.  Hampton Decl. ¶¶ 8, 9.   To this end, Defendants purchased a printing company, Defendant Innovative Printing, from Defendant Marc Peebles, and relocated its facilities to an unmarked warehouse at the back of a medical clinic run by Defendant Byars' wife.  Hampton Decl. ¶ 10; Rosetti Decl. ¶ 4.  Defendant Peebles remained as Vice President of Innovative Printing and continues to run its day-to-day operations.  Hampton Decl. ¶ 10; Rosetti Decl. ¶ 4.

Defendants now had the ability, through Defendant Innovative Printing, to replace in its entirety the International Edition covers with counterfeit U.S. Edition covers.  These counterfeit

covers contain the same look, graphics, title and marks, including trademarks, of Plaintiffs' U.S. Edition textbooks.  Essig Decl. ¶¶ 14, 16.  Indeed, in August 2012, TRG investigators retrieved rolls of counterfeit textbook covers of another publisher's textbook from the dumpsters outside of Innovative Printing's facilities.  Rosetti Decl. ¶ 15.  Where Innovative Printing cannot bind the counterfeit covers onto the textbooks, they ship the printed, uncut paper covers to Defendant Accu Link with a copy of an actual U.S. Edition textbook as a sample of the finished product. Hampton Decl. ¶ 3; Rosetti Decl. ¶ 6.  Not only have former employees of the Murray/Paducah, Kentucky UPS store and TRG investigators seen boxes of these shipments from Innovative Printing to Accu Link, current Accu Link employees have reported that Accu Link has created and bound collegiate-level textbooks on the subjects of Biology and Geometry.  Hays Decl. ¶ 15; Rosetti Decl. ¶ 18.  Indeed, the investigation suggests that Accu Link's owner/operator, Defendant O'Brien, is not only aware of the infringing activities, but has taken steps to conceal it.  Rosetti Decl. ¶ 18.

**4.  Defendants Continue to Rent Counterfeit Textbooks and to Expand Their Enterprise.**

Once Defendants have created the Chop Shop versions of Plaintiffs' copyrighted textbooks, either by altering or replacing Plaintiffs' textbook covers, Defendants rent these counterfeit-covered books to students and other unsuspecting customers who are led to believe it is the U.S. Edition.  In August 2012, Plaintiff Pearson received a copy of its textbook *College Physics* by Young that had been rented through CollegeBookRenter.com.  Essig Decl. ¶ 16.  This book had a book cover for a U.S. Edition book, but was rebound onto an International Edition book.  Unlike the other counterfeit books, this book still retained its International Edition copyright page.  *Id.*  Additionally, where the U.S. Edition contained a drawing of tables printed

on the inside of the front or back cover, the book obtained from CBR had the tables on standalone pages that had been glued into the book.  *Id.*

The counterfeit covers and altered books that Plaintiffs have examined in this case are of a relatively high quality and appear to have been created by a sophisticated operation.  Hays Decl. ¶ 23; Essig Decl. ¶ 28.  It is apparent that Defendants' operations do not exist in order to infringe a limited number of titles or books, but rather are most likely created to reproduce and/or alter large quantities of titles and books.  *Id.*  Indeed, Defendants have grown their operations and continue to profit handsomely from its counterfeiting activity.

CBR, which was begun in 2009, has become a significant retail operation for the textbook rentals.  Among the factors that CBR credits for its success is its massive inventory of "over 250,000 textbooks which eliminates CBR's past dependence on other vendors to timely and correctly ship textbooks to consumers."  Byars Decl. ¶ 4.   But, that massive inventory and retail success is built on brazen copyright and trademark infringement.  By 2011, an estimated 75 percent of the books received by SEB, CBR's supplier, were International Editions that had to be altered. Rosetti Decl. ¶ 13.

SEB employs 50 to 60 employees a month and its sales for the first 8 months of 2012 are over $14 million.  Jones Decl. ¶¶ 15, 23.  CBR's monthly employee averages have increased from 6 in 2009 to 124 in 2011.  Jones Decl. ¶ 16.  Its revenue growth has increased from zero to $19,438,653 for the fiscal year ended October 31, 2011.  Jones Decl. ¶ 17.  Today, CAJM employs 71 individuals who work exclusively for CBR.  Jones Decl. ¶ 18.

Defendants have no intention of ceasing their business activities.  Rather, Defendants project that the textbook rental market will continue to grow over the coming years, and CBR's own website traffic has seen a growth in total number of visitors of 41% in 2011.  Jones Decl. ¶

36.  Defendants claim that CBR's website is the fastest growing destination in terms of total unique visitors among the major market providers of online textbook rental services. *Id.*  A report commissioned by Defendants in September 2011 projects that Defendants companies could have a combined value of as much as $1 billion dollars by 2013 and that CBR's growth rate is the best in the industry.  Jones Decl. ¶ 36-37.  The report further estimates that CBR's revenues will grow to $69 million in 2012 and $117.9 million in 2013.  *Id.*

There can be no doubt that Plaintiffs' textbooks are being altered, copied, disassembled, and rebound with counterfeit covers.  In some instances, it appears that certain pages are being removed (including the copyright page) and other pages are being added. Plaintiffs, however, currently lack complete information to understand the extent of these alterations.

## ARGUMENT FOR TEMPORARY RESTRAINING ORDER

In order to obtain preliminary injunctive relieve, a claimant must demonstrate: (1) "(a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff]'s favor"; (2) they are "likely to suffer irreparable injury in the absence of an injunction"; (3) the "balance of hardships tips in the plaintiff's favor"; and (4) the "'public interest would not be disserved' by the issuance of a preliminary injunction."  *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (citing *eBay v. MercExchange, L.L.C.*, 547 U.S. 388 (2006); *Winter v. Natural Res. Def. Counsel*, 555 U.S. 7 (2008)); *see also Gund, Inc. v. SKM Enters.*, No. 01 Civ. 0882, 2001 U.S. Dist. LEXIS 1324, at *4 (S.D.N.Y. Feb. 14, 2001) (noting that the standards for granting a preliminary injunction motion and temporary restraining order are one in the same) (citations omitted).  In this case, the Court should grant Plaintiffs' Motion

for an Order to Show Cause and for Expedited Discovery because Plaintiffs can demonstrate each of the elements above.

I.      **Plaintiffs Can Show a Likelihood of Success on the Merits.**

Plaintiffs assert five claims in this case—(1) direct copyright infringement, (2) contributory copyright infringement, (3) vicarious copyright infringement, (4) violation of the integrity of copyright management information, and (5) trademark counterfeiting.  In showing the likelihood of success on the merits, Plaintiffs need show only a serious question going to the merits to make them a fair ground for trial.  *See, e .g., Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (holding that plaintiffs can either demonstrate a likelihood of success on the merits or show "a serious question going to the merits to make them a fair ground for trial").   In this case, there is overwhelming evidence to demonstrate likely success.

       **A.  Direct Copyright Infringement**

The elements necessary to succeed on a claim of direct copyright infringement include: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  "Copying" means an infringement of any of the copyright holder's exclusive rights in its original work, including the reproduction and distribution rights.  *Arista Records LLC v. Doe*, 604 F.3d 110, 117 (2d Cir. 2010) (citing *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th. Cir. 2001)).

Copyright protection extends not only to copying of the entirety of the work, but also to copying of a portion of it.  *See Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134 (2d Cir. 2003)  ("[D]efendant may infringe on the plaintiff's work … through

11

literal copying of a portion of it….”); *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1526 (S.D.N.Y. 1991) (copying a portion of a book constitutes copyright infringement). Copying of the covers and assorted pages on the interior of a book constitutes a reproduction under the copyright law.  *See Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co.*, No. 95 Civ. 4008, 1998 U.S. Dist. LEXIS 5578, at *8-9 (S.D.N.Y. April 21, 1998) (holding that the overall design of a book cover is subject to copyright protection); *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 931 (2d Cir. 1994) (copying articles from a book is not a fair use).  Attaching those unauthorized covers to other books and renting them to the public constitutes a distribution.  *See, e.g., Agee v. Paramount Commc'ns*, 59 F.3d 317, 325 (2d Cir. 1995) (“distribution right is right 'publicly to sell, give away, rent or lend any material embodiment of copyrighted work”) (quoting 2 NIMMER ON COPYRIGHT, § 8.11[A] (1993)).

Here, Plaintiffs are owners of valid copyrights for each of the textbooks set forth on Attachment A of the Complaint.[2]  Essig Decl. ¶ 12; Hays Decl. ¶ 11.  Plaintiffs have duly registered their copyrights and have not authorized any of Defendants to reproduce their copyrighted works.  *Id.* at ¶¶ 14 and 15, respectively  Nevertheless, Defendants have without authorization reproduced certain book covers on numerous occasions, including those contained in the three boxes reported by the former UPS store employee.  Hays Decl. ¶ 15.  Additional images of unauthorized reproductions of book covers were shown to Plaintiffs' investigators by existing UPS store employees.  Rosetti Decl. ¶¶ 7, 9.  And, Plaintiffs have been provided with rebound textbooks directly by CBR, as well as from Rafter and MBS who both claim to have received them from CBR.  Hays Decl. ¶¶ 16, 17, 20; Essig Decl. ¶ 16.  These rebound books contain unauthorized copies of the covers that appear on the U.S. Editions.  There can be no

---

[2] *Prima facie* evidence of ownership and validity is established by certificates of registration issued by the Copyright Office.  17 U.S.C. § 410(c).

doubt that Defendants have copied the covers and other assorted pages out of Plaintiffs' U.S. Edition textbooks.

In addition to this unauthorized reproduction, Defendants have also without authorization distributed Plaintiffs' copyrighted textbooks.  After copying Plaintiffs' book covers, Defendants then rebound them onto a different textbook, the International Edition, for which the covers have been torn off.  Defendants then rented those books to consumers in the United States, thereby violating Plaintiffs' exclusive right of distribution.   In these ways, Defendants have directly infringed Plaintiffs' copyrights.

### B.  Contributory Copyright Infringement

Plaintiffs can also demonstrate a likelihood of success on their claim for contributory copyright infringement.  In order to establish a claim for contributory copyright infringement, a claimant must show: (1) direct copyright infringement, (2) defendant knew or should have known about the direct infringement, and (3) defendant's material contribution to the infringing behavior.  *See Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971).

As shown above, Plaintiffs can easily demonstrate a claim for direct infringement by the unauthorized reproductions and distributions of Plaintiffs' textbook covers.  Defendants additionally are liable for contributory infringement because each of Defendants had knowledge of the copying and distribution of Plaintiffs' textbooks and each material contributed to such infringement.  The attached declarations describe a well thought-out plan to create a large-scale counterfeiting operation.  Those declarations describe a scheme in which Defendants were not only well aware of the actions being taken, they in fact were all working cooperatively and collectively to have this counterfeiting and infringement plot succeed.

By Defendant Jones' own admission, CAJM provided the direct management and oversight for the activities of the various businesses. Jones Decl. ¶¶ 9, 24.  In addition to masterminding the overall scheme, Defendants Jones, CAJM, SEB, CBR, Byars, Innovative Printing, Peebles, Accu Link, and O'Brien provided the site and facilities for the infringement. *See Matthew Bender & Co. v. W. Publ'g Co.*, 158 F.3d 693, 706-07 (2d Cir. 1998) (holding that providing "machinery or goods that facilitate the infringement" is a type of material contribution that leads to contributory liability if the machinery or goods have substantial infringing uses), *rev'd in part on other grounds*, 41 Fed. Appx. 507 (2d. Cir. 2002); *see also Faulkner v. Nat'l Geographic Soc'y*, 211 F. Supp. 2d 450, 473-74 (S.D.N.Y. 2002) (finding material contribution where the defendant merely advertised or promoted an infringing product or service).

Similarly, Defendants Rivadeneyra and Inter-Express knew about Jones' activities because they sold International Edition textbooks to Jones and his entities, which were clearly marked as International Editions and not for sale in the United States.  Rosetti Decl. at ¶ 11; Hampton Decl. at ¶ 5.  Their provision of these books constituted a material contribution to the copyright infringement by the Defendants in Murray, Kentucky.  The evidence put forth herein thus demonstrates that Plaintiffs are likely to succeed on their claim of contributory infringement.

### C.  Vicarious Copyright Infringement

Vicarious copyright infringement requires a showing of: (1) direct copyright infringement, (2) financial benefit from the infringing activities, and (3) defendant's right and ability to control the infringement.  *Gershwin*, 443 F.2d at 1161-62 (citing *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304 (2d Cir. 1963)).

As with contributory infringement, there is ample evidence here to clearly show that Defendants had the right and ability to control the infringement and that Defendants benefitted financially from the infringement.  Indeed, the textbook chop shop scheme was contrived for the explicit purpose of financial gain, a success demonstrated by the rapid growth of Defendants' business ventures.  Jones Decl. ¶ 17; Byars Decl. ¶ 7.  As principals and executives of the corporate defendants, Messrs. Jones, Byars, Rivadeneyra, and O'Brien also had the right and ability to control the infringing activity engaged in by the businesses and their employees and had the ability at any time to control the infringement by simply stopping its operation.  Rather than do so, they personally directed and oversaw the infringement for personal gain.

### D.  Violating the Integrity of Copyright Management Information

The DMCA contains provisions intended to preserve the integrity of CMI.  17 U.S.C. § 1202.  CMI consists of any identifying information conveyed in connection with the original work, including but not limited to, the name, including the title, author, copyright owner, terms and conditions, and numbers, symbols, or links that refer to the copyright information.  17 U.S.C. § 1202(c).

The DMCA prohibits the tampering with of CMI in two ways.  First, Section 1202(a) prohibits the knowing provision or distribution of false CMI with the "intent to induce, enable, facilitate, or conceal infringement."  17 U.S.C. § 1202(a).  Section 1202(b) "prohibits intentionally removing or altering CMI, or distributing CMI knowing it has been removed or altered."  *Agence Fr. Presse v. Morel*, 769 F. Supp. 2d 295, 305-06 (S.D.N.Y. 2011) (finding that defendant had violated the DMCA by providing false credit information for photos and by removing CMI located next to the images).

Here, the declarations provided in support of this motion clearly show that Defendants have violated Section 1202(b) of the DMCA. Without going through each of the ways Defendants may have done so, Plaintiffs have in their possession books distributed by Defendants for which the copyright information page has been removed. Those pages include CMI. Essig Decl. ¶ 10; Hays Decl. ¶ 11. There could not be a clearer example of a CMI violation than this.

### E.  Trademark Counterfeiting

To prevail in a trademark counterfeiting action under 15 U.S.C. § 1114(1), a plaintiff must show: (1) it has a valid mark that is entitled to protection under the Lanham Act, (2) the defendant used the mark, (3) in commerce, (4) in connection with the sale or advertising of goods or services, (5) without the plaintiff's consent, and (6) the defendant's use of the plaintiff's mark is likely to cause confusion as to the affiliation, connection, or association of defendant with plaintiff, or as to the origin, sponsorship, or approval of the defendant's goods, services, or commercial activities by plaintiff. *See 1-800 Contacts, Inc. v. WhenU.com, Inc*., 414 F.3d 400, 406-07 (2d Cir. 2005); *see also Time, Inc. v. Petersen Publ'g Co*., 173 F.3d 113, 117 (2d Cir. 1999); *Genesee Brewing Co. v. Stroh Brewing Co*., 124 F.3d 137, 142 (2d Cir. 1997); *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1508-09 (2d Cir. 1997); *Gruner + Jahr USA Publ'g v. Meredith Corp*., 991 F.2d 1072, 1075 (2d Cir. 1993).

Although courts typically apply the eight-factor Polaroid test to determine whether there is a likelihood of confusion between the marks (*Polaroid Corp. v. Polarad Elecs. Corp*., 287 F.2d 492, 495 (2d Cir.1961)), "where counterfeit marks are involved, it is not necessary to perform the step-by-step examination of each *Polaroid* factor because counterfeit marks are inherently confusing." *Fendi Adele S.R.L. v. Filene's Basement, Inc*., 696 F. Supp. 2d 368, 383

(S.D.N.Y. 2010) (quoting *Burberry Ltd. v. Euro Moda, Inc.*, No. 08 Civ. 5781, 2009 U.S. Dist.

LEXIS 53250, at *5 (S.D.N.Y. 2009); *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F.

Supp. 2d 448, 454-55 (S.D.N.Y. 2005)).

Here, Plaintiffs own registered trademarks that they place on their textbook covers.

Essig Decl. ¶ 14; Hays Decl. ¶ 13.  In reproducing Plaintiffs' U.S. Edition covers and placing

them on the International Edition books, Defendants have copied copied and used Plaintiffs'

trademarks without authorization.  *Id*. at ¶¶ 14, 15.  Defendants have inserted those copied

trademarks into commerce by renting the altered textbooks.  Defendants have neither the right to

reproduce nor distribute Plaintiffs' trademarks.  *Id.*  In this case, since the marks being used are

counterfeit, Plaintiffs need not demonstrate any likelihood of confusion.

Based on the foregoing, Plaintiffs are likely to succeed on the merits of their trademark

claim.

**II.      Plaintiffs Will Suffer Irreparable Injury in the Absence of Immediate Injunctive
        Relief.**

Irreparable injury in copyright suits can be harm that "occurs to the parties' legal

interests" and that "cannot be remedied after a final adjudication."  *Salinger*, 607 F.3d at 81

(footnote omitted).  Harm may be irreparable where the loss is difficult to replace or measure, or

where plaintiffs should not be expected to suffer the loss.  *Id*.  Under *Salinger*, courts may no

longer simply presume irreparable harm; rather, plaintiffs must demonstrate that, on the facts of

the case, the failure to issue an injunction would actually cause irreparable harm.  *Id.* at 82 (citing

*eBay*, 547 U.S. at 393).  Courts must pay "particular attention to whether the 'remedies available

at law, such as monetary damages, are inadequate to compensate for [the] injury.'" *Id.* at 80

(quoting *eBay*, 547 U.S. at 391).

There can be little doubt that Plaintiffs would suffer irreparable harm unless this Court issues a temporary restraining order.  Essig Decl. ¶¶ 3-8; Hays Decl. ¶¶ 3-8.  First, Defendants' distribution of International Versions masked as U.S. Editions diminishes the value and market for legitimate U.S. Editions.  A student acquiring what he or she thinks is a U.S. Edition book from Defendant obviously substitutes for that individual acquiring an authentic U.S. Edition book.  Second, losses will be difficult to measure.  While Defendants' sale and rental figures can presumably be tracked, it could be difficult to quantify the impact of Defendants' illegal activities on market prices.  Defendants' unauthorized alteration of Plaintiffs' books might likely harm Plaintiffs' long-established reputation for quality.  Defendants' chop shop procedures do not match Plaintiffs' production process.  Plaintiffs' reputation also stands to suffer when students use a book that they think is the U.S. Edition but which contains different content.  Third, given the vast scope of Defendants' illicit operations, Defendants may be unable to pay Plaintiffs' damages should Plaintiffs' prevail.  These are the sorts of facts that warrant preliminary injunctive relief.  *See WPIX, Inc. v. ivi, Inc.*, No. 11-788-cv, 2012 U.S. App. LEXIS 18155, at *24-30 (2d Cir. Aug. 27, 2012) (irreparable harm found where defendants retransmitted copyrighted programming without permission).

### III.     The Balance of Hardships And Public Interest Tip Decidedly In Plaintiffs' Favor.

As established above, Plaintiffs will suffer irreparable injury without immediate injunctive relief, while Defendants will continue to profit from their illicit infringing activities.  Defendants have no grounds to complain about any harms resulting from the inability to produce and distribute infringing copies of Plaintiffs' textbooks.  *See WPIX*, 2012 U.S. App. LEXIS 18155 at *31 (finding that where the plaintiffs' copyrights are infringed, the defendant "is not legally harmed by the fact that it cannot continue streaming" infringing content).  Based on this

comparison, this Court should find that the balance of hardships tips decidedly in Plaintiffs' favor.

**IV.  The Public Interest Will Not Be Disserved By the Issuance of a Preliminary Injunction.**

Copyright law serves "to promote the Progress of Science and the useful Arts" by providing protection for writings to encourage contributions to innovation and creativity.  U.S. CONST. Art. I, § 8, cl. 8; *see also Salinger*, 607 F.3d at 82 ("The object of copyright law is to promote the store of knowledge available to the public.").  Therefore, the public interest is served when copyright law is properly enforced.  *See WPIX*, 2012 U.S. App. LEXIS 18155, at *32-34.

The Second Circuit recently reaffirmed the public interest in protecting copyrights:

> [T]he public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating television programming. *See Golan v. Holder*, 132 S. Ct. 873, 890 (2012) (citing *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003); *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985)).  Inadequate protections for copyright owners can threaten the very store of knowledge to be accessed; encouraging the production of creative work thus ultimately serves the public's interest in promoting the accessibility of such works. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 961 (2005) (quoting *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975)).
>
> Plaintiffs are copyright owners of some of the world's most recognized and valuable television programming. Plaintiffs' television programming provides a valuable service to the public, including, *inter alia*, educational, historic, and cultural programming, entertainment, an important source of local news critical for an informed electorate, and exposure to the arts. *See Turner*, 512 U.S. at 648. Plaintiffs' desire to create original television programming surely would be dampened if their creative works could be copied and streamed over the Internet in derogation of their exclusive property rights.

*WPIX*, 2012 U.S. App. LEXIS 18155, at *32-34.

The Second Circuit's views on television programming apply with equal force to textbooks.   The creation of copyrighted textbooks provide a valuable benefit to the public. Equally important for the public interest is preserving access to these works internationally,

especially to developing countries.   There is no question in this case that Defendants are

profiting from their extensive illicit activities.  Issuing a preliminary injunction in this matter

would stop Defendants' infringing activity and serve the public interest by properly enforcing

Plaintiffs' valid copyrights, and respecting the integrity of its CMI.

## ARGUMENT FOR EXPEDITED DISCOVERY

Plaintiffs are seeking as part of the Order to Show Cause limited, expedited discovery in

advance of filing a Motion for Preliminary Injunction.

In the Southern District of New York, courts apply a "flexible standard of reasonableness

and good cause" to determine whether expedited discovery is appropriate.  *Digital Sin, Inc. v.*

*Does 1-27*, No. 12 Civ. 3873, 2012 U.S. Dist. LEXIS 78832, at *11 (S.D.N.Y. June 6, 2012).

Historically, courts applied a more stringent standard that required a four-part test showing: "(1)

irreparable injury, (2) some probability of success on the merits, (3) some connection between

the expedited discovery and the avoidance of irreparable injury, and (4) some evidence that the

injury that will result without expedited discovery looms greater than the injury that the

defendant will suffer if the expedited relief is granted." *Notaro v. Koch*, No. 82 Civ. 5773, 1982

U.S. Dist. LEXIS 14842, at *5 (S.D.N.Y. Sept. 17, 1982).  Under either formulation, some

limited expedited discovery is appropriate and necessary.

Plaintiffs need to understand the scope of the illicit activities.  This is essential so that the

infringing product be removed from the marketplace as soon as possible, in order to lessen the

harm to Plaintiffs.  In addition, discovery is needed to identify all those complicit in the illegal

venture, so that they can be named and enjoined.  Finally, discovery will allow further evidence

of the nature and scope of the unlawful activities to be brought into the light of day.  While

Plaintiffs have already put forward evidence that warrants issuance of injunctive relief, illegal

activities such as this occur predominantly behind closed doors and Plaintiffs will be hard-pressed to build a more complete record for preliminary injunctive relief in the absence of such discovery.  *Warner Bros. Records, Inc. v. Payne*, No. W-06-CA-051, 2006 U.S. Dist. LEXIS 65765, at *10 (W.D. Tex. July 17, 2006) ("[P]iracy typically takes place behind closed doors and beyond the watchful eyes of a copyright holder.").

Attached hereto, as Exhibit 7, is Plaintiffs' Request for Expedited Production.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should grant Plaintiff's request for a temporary restraining order against Defendants' counterfeit textbook publishing business, along with limited expedited discovery.

Respectfully submitted,

_____/s/_____
Matthew J. Oppenheim (NY. Bar No. 4314605)
Scott A. Zebrak
Julie C. Chen (NY Bar No. 2797918)
Oppenheim + Zebrak, LLP
4400 Jenifer Street NW, Suite 250
Washington, DC  20015
202-621-9027
866-766-1678 (fax)

Counsel for Plaintiffs

Dated:  September 19, 2012